B/O

Fee Paid

**FILED**
CLERK, U.S. DISTRICT COURT

12/16/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ RYO _____ DEPUTY

Nicomedes Sy Herrera (SBN 275332)
*nherrera@herrerakennedy.com*
Laura E. Seidl (SBN 269891)
*lseidl@herrerakennedy.com*
Bret D. Hembd (SBN 272826)
*bhembd@herrerakennedy.com*
**HERRERA KENNEDY LLP**
3500 W. Olive Ave., Suite 300
Burbank, CA 91505
Tel: (213) 394-3100

David B. Harrison, Esq. (*pro hac vice to be filed*)
*dharrison@shnlegal.com*
Alexandria D. Martinez, Esq. (*pro hac vice to be filed*)
*amartinez@shnlegal.com*
**SPIRO HARRISON & NELSON**
363 Bloomfield Avenue, Suite 2C
Montclair, NJ 07042
(973) 744-2100

*Attorneys for Plaintiff-Relator*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> *ex rel*. [UNDER SEAL], <br><br> Plaintiff, <br> v. <br><br> [UNDER SEAL], <br><br> Defendant. | **Civil Action No.** 8:24-CV-02704-AB(ADSx) <br> **Hon.** _____ <br> **COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729-3733** <br><br> **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** <br><br> **JURY TRIAL DEMANDED** <br><br> DO NOT ENTER ON PACER DO NOT PLACE IN PRESS BOX |

Nicomedes Sy Herrera (SBN 275332)
*nherrera@herrerakennedy.com*
Laura E. Seidl (SBN 269891)
*lseidl@herrerakennedy.com*
Bret D. Hembd (SBN 272826)
*bhembd@herrerakennedy.com*
**HERRERA KENNEDY LLP**
3500 W. Olive Ave., Suite 300
Burbank, CA 91505
Tel: (213) 394-3100

David B. Harrison, Esq. (*pro hac vice to be filed*)
*dharrison@shnlegal.com*
Alexandria D. Martinez, Esq. (*pro hac vice to be filed*)
*amartinez@shnlegal.com*
**SPIRO HARRISON & NELSON**
363 Bloomfield Avenue, Suite 2C
Montclair, NJ 07042
(973) 744-2100

*Attorneys for Plaintiff-Relator*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* JOHN DOE,<br><br>          Plaintiff-Relator,<br><br>     vs.<br><br>ELITE E.N.T. & PLASTIC SURGERY CENTER, INC.,<br><br>          Defendant. | **Civil Action No. _____**<br>**Hon. _____**<br>**COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729-3733**<br><br>**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>**JURY TRIAL DEMANDED**<br><br>DO NOT ENTER ON PACER<br>DO NOT PLACE IN PRESS BOX |

- 1 -

Complaint (UNDER SEAL)

Relator John Doe ("Relator"), on behalf of the United States (the "Government"), brings this action against Elite E.N.T. & Plastic Surgery Center, Inc. ("Defendant" or "Elite E.N.T.") for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA").

## INTRODUCTION

1.      This is an action to recover damages and civil penalties on behalf of the United States under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, in connection with Elite E.N.T.'s submission of false claims to the Government for reimbursement for COVID-19 testing services.

2.      From at least March 2020 through December 2020 (the "Relevant Time Period"), Defendant Elite E.N.T., a healthcare provider that tested patients for COVID-19, systematically defrauded the patient enrollment system for the federal program that reimbursed health care providers furnishing COVID-19 testing to uninsured persons (the "Uninsured Program") by creating fictitious patient names and billing the Government for tests it did not provide.

3.      During the COVID-19 crisis, the Federal Government funded the Uninsured Program to support COVID-19 testing of uninsured individuals by eligible healthcare providers across the United States.

4.      While the tens of billions of dollars in funding were intended to ensure uniform and continuous testing of the large uninsured segment of the U.S. population (approximately 25.6 million people), it became a target for opportunistic providers to implement creative schemes to generate huge amounts of ill-gotten wealth.

5.      For approximately nine months, Elite E.N.T. submitted false and fraudulent claims to the Uninsured Program with impunity by enrolling thousands of fictitious patients into the Uninsured Program and billing for non-existent services to those fake patients.

- 2 -

Complaint (UNDER SEAL)

6.      To effectuate its scheme, Elite E.N.T. created hundreds of "dummy" uninsured patients across many different counties with multiple Social Security Numbers.

7.      For example, Elite E.N.T. registered the name ███████████ numerous times with different member ID numbers but the same birth date of August 4, 1962.

8.      The creation of fake names and the submission of claims for services not rendered was material to Elite E.N.T.'s claims for payment and is a violation of the FCA.

9.      Even for claims on behalf of real people who in fact received the services Elite E.N.T. claimed, Elite E.N.T. submitted, or caused to be submitted, ineligible and fraudulent claims to the Uninsured Program for COVID-19 testing to persons who had health coverage on the relevant date of the service.

10.     For example, Elite E.N.T. billed for the patient ███████████, under one Member ID and birthdate, for multiple services allegedly performed in one day. Also, while tests typically cost about $123.46, Elite E.N.T. received much larger sums of money, sometimes over $10,000 for a purported test (which likely was some other ineligible service if actually performed). By knowingly disregarding its obligation to only seek reimbursement from the Uninsured Program for eligible COVID-19 testing, Defendant Elite E.N.T. fraudulently obtained tens of millions of dollars from the Government.

11.     Elite E.N.T. was incorporated in 2000 in the state of California. Upon information and belief, Dr. Anthony H. Dinh is the Founder of Elite E.N.T. The company's principal address is located in Garden Grove, California.

12.     The extraordinary profits obtained by Elite E.N.T. through the fraudulent scheme came at the expense of the public treasury and, ultimately, patients who lacked health insurance—*i.e.* the intended beneficiaries of the program. Defendant's

Complaint (UNDER SEAL)

fraudulent scheme drained limited funds appropriated by Congress to cover COVID-19 testing costs for uninsured persons. In March 2022, the Government announced that it would stop accepting claims for reimbursement for COVID-19 testing due to a lack of sufficient funding.

13. In sum, Elite E.N.T. violated the FCA by falsely billing the Government for reimbursement on COVID-19 testing through the Uninsured Program. This action seeks to recover tens of millions of dollars (or more) for the Government in connection with those violations.

## PARTIES

14. The United States is the real party of interest in this action.

15. Relator John Doe is an employee of Optum Technology ("Optum") at UnitedHealth Group ("UHG").

16. Defendant Elite E.N.T. is headquartered in Garden Grove, California and incorporated under the laws of California.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732.

18. This Court may exercise personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) because Defendant can be found, resides, or transacts business in this District, or an act proscribed by section 3729 occurred in this District.

19. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendant can be found, resides, or transacts business in this District, or an act proscribed by section 3729 occurred in this District. Defendants' principal place of business is also located in this District.

20. Relator is not aware that substantially the same allegations or transactions alleged in this Complaint have been publicly disclosed in any of the enumerated statutory channels under 31 U.S.C. § 3730(e)(4)(A)(i)-(iii). In any event, this Court has

- 4 -
Complaint (UNDER SEAL)

jurisdiction under 31 U.S.C. § 3730(e)(4), because the Relator is an "original source" because he has voluntarily provided his information to the Government before filing this Complaint (including on November 6, 2024), and he has knowledge that is both direct and independent of, and materially adds to, any public disclosures to the extent they may exist.

**STATUTORY BACKGROUND**

**The Uninsured Program**

21.    In response to the public health emergency caused by the global COVID-19 pandemic, the United States Congress enacted various legislation to ensure that persons in the United States could receive COVID-19 testing at no cost to themselves. Congress carefully delineated who would cover the cost of this testing. For individuals with private health insurance coverage, Congress mandated that private health insurers cover these persons' medically necessary COVID-19 testing. *See* Families First Coronavirus Response Act (the "FFCRA"), Pub. L. No. 116-127, 134 Stat. 178, 201 (2020) *as amended by the* Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281, 366-367 (2020). Congress similarly required that government health care programs, such as Medicare or Medicaid, cover medically necessary COVID-19 testing for persons enrolled in such programs. *See* FFCRA, Pub. L. No. 116-127, 134 Stat. 178, 202-208 (2020).

22.    For the remaining individuals who did not have health insurance coverage (approximately 8.6% of persons in the United States), Congress appropriated limited sums of funding that permitted HHS to reimburse health care providers that provided COVID-19 testing to persons who did not have any health care coverage on the relevant date of service ("Uninsured Individuals"). *See* FFCRA, Pub. L. No. 116-127, 134 Stat. 178, 182, 206 (2020); Paycheck Protection Program and Health Care Enhancement Act (the "Paycheck Protection Act"), Pub. L. No. 116-139, 134 Stat. 620, 626 (2020); CARES Act, Pub. L. No. 116-136, 134 Stat. 281, 563 (2020); American Rescue Plan

- 5 -

Complaint (UNDER SEAL)

Act, Pub. L. No. 117-2, 135 Stat. 4, 236 (2021).

23.     Health Resources and Services Administration ("HRSA"), an agency within the United States Department of Health and Human Services ("HHS"), established and administered the Uninsured Program, formally titled the *COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment, and Vaccine Administration for the Uninsured*. In order to protect the integrity of the program, HRSA mandated that any providers seeking reimbursement from the Uninsured Program agree to specific Terms and Conditions along with making attestations regarding their compliance with specific program requirements.

24.     HRSA contracted with UHG to help administer the Uninsured Program.

25.     Upon enrollment, when a patient indicated that he or she did not have health insurance, he or she was required to provide his or her social security number, driver's license, or state ID number in order to confirm their insurance status.

26.     The submission of claims to the Uninsured Program involved several steps, and providers were required to use two systems. First, though an online portal known as the "UIP Portal," health care providers had to enroll in the Uninsured Program and submit a "patient roster." The patient roster contained identifying information regarding the providers' uninsured patients, including the patient's birthdate and the patient's gender. In order to upload any patient roster, however, the provider had to make attestations to HRSA regarding these patients (the "Patient Roster Attestations").

27.     The Patient Roster Attestations included a representation from the provider that they had "checked for health care coverage eligibility and confirmed that the patient is uninsured, and does not have employer-sponsored or individual coverage, Medicare or Medicaid and that no other payer will reimburse for COVID-19 testing or care for the patient."

28.     Further, in the Patient Roster Attestations, the providers had to attest that they had read and agreed to the Uninsured Program's Terms and Conditions ("Terms

Complaint (UNDER SEAL)

and Conditions"). Those Terms and Conditions (which were linked and available on the Uninsured Program's website) specifically prohibited providers from seeking reimbursement for COVID-19 testing that: (1) had been provided to patients who had any health care coverage at the time the services were provided; or (2) would be (or had been) reimbursed by another payor. The Terms and Conditions also contained the following statement (emphasis added):

> The Recipient certifies that all information it provides as part of its application for the Payment, as well as all information and reports relating to the Payment that it provides in the future at the request of the Secretary or Inspector General, are true, accurate and complete, to the best of its knowledge. The Recipient acknowledges that any deliberate omission, misrepresentation, or falsification of any information contained in a request for reimbursement or future report may be punishable by criminal, civil, or administrative penalties, including but not limited to revocation of Medicare billing privileges, exclusion from federal health care programs, and/or the imposition of fines, civil damages, and/or imprisonment.

29. By agreeing to the Terms and Conditions, providers not only acknowledged their ongoing obligation to only submit accurate claims on behalf of uninsured patients but also the materiality of their compliance with the Program's regulations. ("The Recipient acknowledges that each time the Recipient submits such claims for reimbursement, each claim must be in full compliance with these Terms and Conditions, and submission of those claims confirms the Recipient's ongoing compliance with these Terms and Conditions. The Recipient acknowledges that the Recipient's full compliance with all Terms and Conditions is material to the Secretary's decision to

- 7 -

Complaint (UNDER SEAL)

disburse funds to the Recipient. Non-compliance with any Term or Condition is grounds for the Secretary to recoup some or all of the payments made.")

30.   After a provider attested to compliance with these program requirements and submitted its patient roster, UHG (on behalf of HRSA) performed patient insurance eligibility checks for patients whose Social Security Numbers had been included in patient rosters submitted by providers to attempt to identify individuals with health insurance coverage. HRSA established the following policies regarding these patient insurance eligibility checks for UHG to follow. If UHG's eligibility check did not identify health insurance for an individual on a patient roster, UHG would assign the patient a Temporary Patient ID. Conversely, if UHG found that a patient included in a roster had insurance, it would not issue a Temporary Patient ID.

31.   Claims for COVID-19 testing submitted to the Uninsured Program that were not accompanied by a valid Temporary Patient ID would be rejected. Providers could then submit claims for reimbursement to the Uninsured Program by using the Temporary Patient IDs issued by UHG in claims submissions made through the Medicare Electronic Data Interchange, a system widely used by health care providers.

32.   The Uninsured Program generally reimbursed providers at rates published by the Centers for Medicare and Medicaid Services ("CMS"), which published Healthcare Common Procedure Coding System ("HCPCS") codes that were used in providers' electronic claims submissions to the Uninsured Program. Through these HCPCS codes, the providers identified the specific services rendered. The Uninsured Program reimbursed providers as much as $100 for providing a COVID-19 test, and an additional $23.46 for specimen collection.

33.   HRSA also provided ongoing guidance to providers. For example, HRSA published "Frequently Asked Questions" ("FAQs") and corresponding answers on the Uninsured Program's website, such as the following FAQ about Uninsured Individuals:

- 8 -

> **Who is considered to be an "uninsured individual"**
>
> **for purposes of providers requesting reimbursement**
>
> **for testing, treatment, or vaccine administration?**
>
> For claims for COVID-19 testing and testing- related items and services, treatment of positive cases of COVID-19, and vaccine administration claims, a patient is considered uninsured if the patient did not have any health care coverage at the time services were rendered.

HRSA, *FAQs for COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment and Vaccine Administration FAQs* (published May 2021).

34.   Further, the Uninsured Program's website informed providers, that if they make direct contact with the patients, the provider should make its own "best efforts to confirm that the patient was uninsured."

35.   The Uninsured Program could only reimburse providers using the funds that had been appropriated by Congress. On March 16, 2022, HRSA informed providers that, on March 22, 2022, the Uninsured Program would stop accepting new claims for COVID-19 testing and treatment due to a lack of sufficient funds.

**The False Claims Act**

36.   The FCA establishes civil penalties and treble damages liability to the United States for an individual who, or entity that, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1).

37. "Knowingly" is defined to include actual knowledge, reckless disregard, and deliberate ignorance. 31 U.S.C. § 3729(b)(1). No proof of specific intent to defraud is required. *Id*.

Complaint (UNDER SEAL)

38.   In addition to treble damages, the FCA also provides for assessment of a civil penalty for each violation or false claim. *Id.* at § 3729(a).

## SPECIFIC FACTUAL ALLEGATIONS

### I.      Elite E.N.T. Took Advantage of a Health Care Crisis

39.     Elite E.N.T. was founded in 2000 in California. Upon information and belief, Elite E.N.T.'s founder is Dr. Anthony Dinh.

40.     Elite E.N.T. took advantage of business opportunities that arose out of the COVID-19 crisis, launching itself into COVID-19 testing. Prior to the onset of COVID-19, however, upon information and belief, Elite E.N.T. was primarily focused on performing plastic surgery, laser rejuvenation, and ear, nose, and throat services.

41.     In March 2020, the global pandemic necessitated extensive testing of individuals who may be infected with the COVID-19 virus.

42.     In furtherance of this effort, healthcare providers, like Elite E.N.T., despite being a plastic surgery center and ear, nose, and throat provider, began to operate testing sites and laboratories across the country to meet this demand.

43.     Elite E.N.T. was able to bill private insurers for tests issued to insureds and the Government for tests issued to the uninsured.

44.     Over the course of approximately nine months, Elite E.N.T. billed the Government for over $50 million in tests performed on purportedly thousands of uninsured patients.

45.     And yet, as explained below, the underlying claims data for these tests confirms that many of them were illegitimate and the claims for payment associated with them fraudulent.

### II.     Defendant's Fraudulent Billing Practices

#### A.      The UHG Claims Data

46.     The federal government contracted with UHG to be the sole administrator of the COVID-19 Uninsured Program. In this capacity, UHG maintained the portal

- 10 -

Complaint (UNDER SEAL)

through which patients were enrolled by providers, processed the claims submitted by the provider, submitted the claims to the Government by providers, and issued payments to the providers when they were made by the Government. Accordingly, UHG maintained all of the claims data related to the Uninsured Program.

47. The data confirm that millions of claims were fraudulently submitted for uninsured patients, for tests that were not performed, and for tests that were purportedly performed on people that do not exist.

48. The following chart shows the Top 11 states by population, according to

| State | Total # of Uninsured Patients Submitted | Total # of Uninsured members with Claims | State Pop - Uninsured Non-elderly (0-64) - 2022 | Overall State Pop - NST-EST2021 | % of Uninsured Members with Claims against State Uninsured | % of Uninsured Members with Claims against State Population |
|---|---|---|---|---|---|---|
| CA | 41,271,955 | 32,395,691 | 2,487,800 | 39,538,223 | 1302% | 82% |
| TX | 31,310,252 | 25,160,376 | 5,032,400 | 29,145,505 | 500% | 86% |
| FL | 26,588,019 | 21,979,230 | 2,495,000 | 21,538,187 | 881% | 102% |
| NY | 16,666,217 | 12,001,334 | 931,500 | 20,201,249 | 1288% | 59% |
| PA | 4,011,298 | 3,099,566 | 712,300 | 13,002,700 | 435% | 24% |
| IL | 16,709,715 | 13,064,738 | 825,900 | 12,812,508 | 1582% | 102% |
| OH | 2,665,274 | 2,235,041 | 693,000 | 11,799,448 | 323% | 19% |
| GA | 7,341,959 | 6,265,332 | 1,310,300 | 10,711,908 | 478% | 58% |
| NC | 5,743,409 | 4,648,563 | 1,001,600 | 10,439,388 | 464% | 45% |
| MI | 3,575,537 | 2,958,959 | 470,700 | 10,077,331 | 629% | 29% |
| NJ | 9,902,902 | 7,780,456 | 617,300 | 9,288,994 | 1260% | 84% |

2022 census data. In those states, the number of uninsured patients for whom claims were submitted far exceeded the number of uninsured in those states in all cases, and even exceeded the total population in several of those states.

49. For example, in California, the Uninsured Program enrolled 13 times as many uninsured members as there were uninsured people in the entire state. Similarly, in Florida, the Uninsured Program enrolled almost 9 times as many uninsured members as there are uninsured people in the state, an amount that even exceeded the entire population of Florida.

50. The data show that the Uninsured Program became a feeding frenzy for opportunistic and unscrupulous healthcare providers who took advantage of a healthcare crisis and a lack of oversight.

Complaint (UNDER SEAL)

**B. The Elite E.N.T. Claims Data**

51.    The data specific to Elite E.N.T. confirm that it was a substantial contributor to this widespread falsification of claims.

52.    For example, the following chart demonstrates several indicia of fraud in the Elite E.N.T. data:

| Fed Tax ID Nbr | Prov Name | Last Name | First Name | DOB | Mem Count | Claim Count | Paid Count | Not Paid Count | COB Count | Total Paid Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| 155670407 | ELITE ENT & ELITE ENT & PLASTIC SURGERY MED CNTR | | | 8/4/ | 6 | 28 | 28 | 0 | 0 | ########## *111,927.48* |
| 155670407 | ELITE ENT & PLASTIC SURGERY MED CNTR | | | 7/5/ | 5 | 25 | 25 | 0 | 0 | $ 81,611.34 |
| 155670407 | ELITE ENT & PLASTIC SURGERY MED CNTR | | | 3/8/ | 5 | 27 | 26 | 1 | 0 | $ 67,178.57 |

53.    This chart shows that Elite E.N.T. enrolled six ▮▮▮▮▮ identities with the birth date August 4, ▮▮▮ and received a total of $111,927.48 for associated testing. Not only does Elite E.N.T. claim that they tested six ▮▮▮▮ ▮▮▮▮▮▮▮ identities with the same birth date, but the amount of money received from the Government is astronomical. Upon information and belief, tests typically cost $123.46. Accordingly, based upon a cost of $123.46 per test, these six people with the same birth date and name would have to have been tested a total of 906 times in nine months. The claim count, however, is only 28, demonstrating that Elite E.N.T. billed the government for much more than the normal cost of administering a test (*i.e.*, nearly $3,997.41 per test, instead of $13.46).

54.    The other two names in this chart show similar indicia highly probative of fraud. Elite E.N.T. claims that it enrolled five ▮▮▮▮▮▮▮ identities, all born on July 5, ▮▮▮ and received a total of $81,611.34 for testing. Elite E.N.T. further claims that it enrolled five ▮▮▮▮▮ identities, all born March 8, ▮▮▮ and received a total of $67,178.57.

55.    The data make clear that Elite E.N.T billed for services not performed and created "dummy" patients with the same names and birth dates. The following chart provides additional evidence of Elite E.N.T.'s scheme:

- 12 -

Complaint (UNDER SEAL)

56.    This chart shows that the name ███████████████ is associated with one birth date, six Member ID numbers, one zip code, and multiple dates of service. Sometimes, such as on September 28, 2020, two tests were allegedly administered to one of the ██████████████ identities. Remarkably, this testing allegedly cost over $10,000.

57.    Similar records highly probative of fraud abound in the Elite E.N.T. data. Below is yet another chart demonstrating highly probative indicia of fraud:

58.    According to this chart, Elite E.N.T. tested ██████████████ six times in September 2020 and seven times in October 2020. Two tests were performed on September 19, 2020. Two tests were also performed on October 10, 2020. The costs of these tests, once again, were astronomical. One was reimbursed at over $11,000.

- 13 -

Complaint (UNDER SEAL)

59.    Incredibly, Elite E.N.T. received from the Government $62,067 from billing for patients – 12 in total – with the same name being tested on the same day.

| Provider Name | Sum of Mem Count | Sum of Paid Count | Sum of Total Paid Amount |
|---|---|---|---|
| ELITE ENT 1 | | | |
| ELITE ENT & PLASTIC SURGERY MED CNTR | 12 | 20 $ | 62,067 |

60.    What is clear from this claims data is that Elite E.N.T billed for patients that do not exist, billed for services that could not have happened, and billed for amounts that could not have been legitimately charged.

61.    Elite E.N.T.'s creation of fictional individuals to bill for services not rendered at astronomically absurd prices resulted in the submission of false claims to the Government in violation of the FCA.

**III.    Elite E.N.T. Damaged the Government Through the Submission of False Claims**

62.    Between March 2020 and December 2022, Elite E.N.T. billed and received over $50 million from the Uninsured Program.

- 14 -

Complaint (UNDER SEAL)

| Provider Name byDate | ELITE ENT & PLASTIC SURGERY MED CNT by Received Date | ELITE ENT & PLASTIC SURGERY MED CNT by Service Date |
|---|---|---|
| Sum of Total - Paid Amount | $ 50,277,227 | $ 50,277,227 |
| Sum of Feb 2020 - Total Paid Amount | | $ - |
| Sum of Mar 2020 - Total Paid Amount | | $ 2,413,008 |
| Sum of Apr 2020 - Total Paid Amount | | $ 2,898,712 |
| Sum of May 2020 - Total Paid Amount | $ - | $ 6,377,359 |
| Sum of Jun 2020 - Total Paid Amount | $ - | $ 8,423,298 |
| Sum of Jul 2020 - Total Paid Amount | $ - | $ 10,305,717 |
| Sum of Aug 2020 - Total Paid Amount | $ - | $ 8,178,354 |
| Sum of Sep 2020 - Total Paid Amount | $ 3,728,829 | $ 8,142,084 |
| Sum of Oct 2020 - Total Paid Amount | $ 9,027,838 | $ 3,329,494 |
| Sum of Nov 2020 - Total Paid Amount | $ 7,911,339 | $ 208,181 |
| Sum of Dec 2020 - Total Paid Amount | $ 10,030,575 | $ 1,019 |
| Sum of Jan 2021 - Total Paid Amount | $ 12,054,337 | $ - |
| Sum of Feb 2021 - Total Paid Amount | $ 6,926,224 | $ - |
| Sum of Mar 2021 - Total Paid Amount | $ 598,085 | $ - |
| Sum of Apr 2021 - Total Paid Amount | $ - | $ - |
| Sum of May 2021 - Total Paid Amount | $ - | $ - |
| Sum of Jun 2021 - Total Paid Amount | $ - | $ - |
| Sum of Jul 2021 - Total Paid Amount | $ - | $ - |
| Sum of Aug 2021 - Total Paid Amount | $ - | $ - |
| Sum of Sep 2021 - Total Paid Amount | $ - | $ - |
| Sum of Oct 2021 - Total Paid Amount | $ - | $ - |
| Sum of Nov 2021 - Total Paid Amount | $ - | $ - |
| Sum of Dec 2021 - Total Paid Amount | $ - | $ - |
| Sum of Jan 2022 - Total Paid Amount | $ - | $ - |
| Sum of Feb 2022 - Total Paid Amount | $ - | $ - |
| Sum of Mar 2022 - Total Paid Amount | $ - | $ - |
| Sum of Apr 2022 - Total Paid Amount | $ - | |

## COUNT I

### False Claims Act: Presentation of False Claims

### 31 U.S.C. § 3729(a)(1)(A)

63. Relator repeats and incorporates by reference the allegations above as if fully contained herein.

64. As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendant has "knowingly present[ed], or cause[d] to be presented, a false or fraudulent claim for payment or approval" in violation of 31 U.S.C. § 3729(a)(1).

65. As a result of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the

- 15 -

Complaint (UNDER SEAL)

United States is entitled to statutory penalties[1] for each and every violation of 31 U.S.C. § 3729 arising from Defendant's unlawful conduct as described herein.

## COUNT II

### False Claims Act: Making or Using a False Record
### or Statement to Cause Claim to be Paid
### 31 U.S.C. § 3729(a)(1)(B)

66.    Relator repeats and incorporates by reference the allegations above as if fully contained herein.

67.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendant has "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement material to a false claim" – *i.e.*, the false certifications and representations made or caused to be made by the defendant – to get a false or fraudulent claim paid or approved by the Government" in violation of 31 U.S.C. § 3729(a)(1)(B).

68.    As a result of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to statutory penalties for each and every violation of 31 U.S.C. § 3729 arising from Defendant's unlawful conduct as described herein.

## COUNT III

### False Claims Act: Retaining Overpayment
### 31 U.S.C. § 3729(a)(1)(G)

69.    Relator repeats and incorporates by reference the allegations above as if fully contained herein.

70.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendant has "knowingly ma[de], use[d], or cause[d] to be

---

[1] A 2015 amendment to the False Claims Act authorized the U.S. Department of Justice to periodically inflation-adjust these penalties. Effective February 12, 2024, the minimum penalty is $13,946, and the maximum is $27,894.

- 16 -

Complaint (UNDER SEAL)

made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceal[ed] or knowingly and improperly avoid[ed] or decrease[d] an obligation to pay or transmit money or property to the Government" in violation of 31 U.S.C. § 3729(a)(l).

71.     As a result of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to statutory penalties for each and every violation of 31 U.S.C. § 3729 arising from Defendant's unlawful conduct as described herein.

### PRAYER

WHEREFORE, Relator, on behalf of the United States, respectfully requests that:

a.     This Court enter an order determining that Defendant violated the FCA by making false statements and records to cause false claims to be submitted to the United States;

b.     This Court enter an order requiring Defendant to pay treble damages and the maximum civil penalties allowable to be imposed for each false or fraudulent claim presented to the United States;

c.     This Court enter an order requiring Defendant to pay all expenses and attorney's fees and costs associated with this action;

d.     This Court enter an order paying Relator the maximum statutory award for its contributions to the prosecution of this action; and

e.     For pre- and post-judgment interest, costs, and any and all other relief as this Court determines to be reasonable and just.

Complaint (UNDER SEAL)

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Relator requests a trial by jury.

Dated:  December 16, 2024            Respectfully submitted,

**HERRERA KENNEDY LLP**


By: *s/ Bret D. Hembd*

     Bret D. Hembd

Nicomedes Sy Herrera (SBN 275332)
*nherrera@herrerakennedy.com*
Laura E. Seidl (SBN 269891)
*lseidl@herrerakennedy.com*
Bret D. Hembd (SBN 272826)
*bhembd@herrerakennedy.com*
**HERRERA KENNEDY LLP**
3500 W. Olive Ave., Suite 300
Burbank, CA 91505
Tel: (213) 394-3100

-and-

David B. Harrison, Esq.
(*pro hac vice to be filed*)
*dharrison@shnlegal.com*
Alexandria D. Martinez, Esq.
(*pro hac vice to be filed*)
*amartinez@shnlegal.com*
**SPIRO HARRISON & NELSON**
363 Bloomfield Avenue, Suite 2C
Montclair, NJ 07042
(973) 744-2100

*Attorneys for Plaintiff-Relator*

Complaint (UNDER SEAL)